COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| UNIT 82 JOINT VENTURE, | | No. 08-08-00159-CV |
| FIVE STAR HOLDING COMPANY, | § | |
| INC., FIVE STAR HOLDING | | Appeal from |
| MANAGEMENT, L.L.C., and | § | |
| 1320/1390 DON HASKINS, LTD., | | 327th District Court |
| | § | |
| Appellants, | | of El Paso County, Texas |
| | § | |
| v. | | (TC # 2005-1987) |
| | § | |
| MEDIACOPY TEXAS, INC., | | |
| A DELAWARE CORPORATION and | § | |
| INFODISC GLOBAL HOLDING, INC., | | |
| A DELAWARE CORPORATION, | § | |
| | | |
| Appellees. | § | |

**O P I N I O N**

The parties disagree about the very nature of this case. Appellants describe it as a receivership case involving a property owner's claims for loss of property, damages to its property, and recovery in quantum meruit of the rental value of its commercial warehouse, noting that the jury found $3,500,000 in damages caused by the receiver. Appellees counter that, "long story short, this is really just a disgruntled landlord who doesn't like being relegated to the status of a mere claimant. He wants to be able to . . . get money that he wouldn't be otherwise entitled to because he is afraid he is not going to get it from his tenant who is in bankruptcy." Aye, there's the rub.[1]

**FACTUAL SUMMARY**

We begin by identifying the parties. Five Star Holding Company, Inc. owns a 200,000 square

---

[1] William Shakespeare, *Hamlet*, Act 3, Scene 1 ("To be or not to be" soliloquy).

foot warehouse (the Premises) located at 1390 Don Haskins in El Paso. A separate entity--1320/1390 Don Haskins Ltd.--owns the lease for the Premises. Jerry Ayoub is the president of Five Star, the manager of Five Star Holding Management, L.L.C., and an authorized representative of 1320/1390 Don Haskins Ltd. For clarity, we will refer to Appellants collectively as Landlord. In 1997, Landlord leased the Premises to Mediacopy, Inc., a California corporation, spending nearly $3.8 million to finish out the warehouse to the tenant's specifications. Under the terms of the lease, the tenant was required to replace any broken or removed equipment, fixtures, or appurtenances to the building with equipment, fixtures and appurtenances of substantially the same quality. The tenant was also required to repair all damages arising from replacement. The original lease was modified in May 1998, July 2000, and October 2000. At no time did Mediacopy, Inc. sublease the Premises.

Mediacopy, Inc. and Mediacopy Texas, Inc. (MTI) are subsidiaries of Infodisc Global Holdings, Inc., which in turn is a wholly owned subsidiary of Infodisc Technology Co., Ltd. MTI and Infodisc Global are Delaware corporations. These companies manufactured and replicated DVD and videotaped recordings of movies, television programming, specialty films, and other types of entertainment and informational programming. The record is unclear precisely when MTI began utilizing the Premises, but the company did lease nearby property from Landlord.

*Bank Loans and Bankruptcy*

On August 28, 2003, MTI and Infodisc Global entered into a security agreement and credit agreement with International Commercial Bank of China (ICBC). Two weeks later, on September 12, MTI and Infodisc Global executed six promissory notes totaling $16,560,000. These loans were secured by a lien on all machinery, equipment, and fixtures located at various locations of operation, including the Premises in El Paso. On September 12, 2004, MTI and Infodisc Global defaulted on the loans. Mediacopy, Inc. filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Central District of California on October 22, 2004. Attached to the petition was a tenant estoppel certificate evidencing that Infodisc Global is a corporation "d/b/a Mediacopy, a California corporation." Landlord was duly listed as a creditor. Oddly, the bankruptcy was dismissed on December 5, 2005, for "failure to appear at 341 meeting for the second time."

*The California Receivership Order*

On November 30, 2004--during the pendency of the bankruptcy proceedings--ICBC sued MTI and Infodisc Global in California state court and sought a receivership for the purpose of liquidating the collateral. It also sued "Does 1 through 100" whose true names and capacities-- whether individual, corporate, or associate--were unknown but were believed to be responsible either contractually or tortiously. Landlord was not notified of this proceeding. On January 13, 2005, the California state court appointed Robb Evans as Receiver. Reciting an agreement between ICBC, MTI, and Infodisc Global to liquidate all of the assets, the California receivership order required the Receiver to seize and sell the assets of MTI and Infodisc Global at its business locations in California, Nevada, Texas, and Canada. Landlord's Premises at 1390 Don Haskins were specifically mentioned. On March 29,2005, the California court approved Maynards Industries, Ltd. (Auctioneer) as the Receiver's agent to liquidate the assets. Although the Receiver claimed under

oath to have prepared an inventory of MTI's assets, an agent from Maynards testified that he--not Robb Evans--directed two former employees of MTI to *update* an inventory previously prepared by MTI.

*The Texas Receivership Order*

To sell the receivership assets, ICBC sought and obtained an ancillary receivership in the 327th Judicial District Court of El Paso County, Texas on March 24, 2005. Landlord received no notice, although the assets were located on his property. Judge Linda Chew appointed Robb Evans as the Ancillary Receiver. Auctioneer and the Receiver then arranged for a private sale and public auction in accordance with the California and Texas receivership orders. The auction was scheduled for June 14-15.

*Petition in Intervention*

On June 1, 2005, Landlord filed an original petition in intervention and sought a temporary restraining order to prevent the private sale and public auction. At the hearing, counsel for Landlord advised the court that although Mediacopy was the lessee, Landlord had recently learned that all of the personalty within the warehouse allegedly belonged to MTI:

> [Mr. Haugland]: Mediacopy, Inc. Was [sic] converted to a Chapter 7 bankruptcy on Tuesday of this week. We have asked them to abandon these leasehold premises and we are anticipating that that will happen any day now.
>
> Mediacopy, Inc. Has [sic] no assets, no business operations, no nothing. But they have been utilizing that bankruptcy to prevent my client the landlord from exercising his landlord rights in Texas relative to this property where all of the apparent physical assets of the operation have been housed for the last several months. . . . [M]y clients have been sitting back there trying to negotiate with the bank the receiver [sic] about what can be removed from the premises, who is going to be responsible for the damages to the property, what stays, what goes. And the problem we've had, Your Honor, is my client is not being allowed access to the property. So we don't know what's being removed but my client put more than a million dollars of tenant improvements into this property for this tenant and under Texas law, those improvements stay with the property rather than go.

The trial court denied the restraining order and instructed the Receiver to move forward with the sale.[2] Although Landlord was ordered not to interfere with the pre-sales or auction of assets, the trial court allowed it to identify and photograph the assets it claimed to own so that ownership could be determined after the sale. Liquidation of the assets netted $7,573,896.46. The Receiver vacated the premises on July 27, 2005. ICBC took a default judgment against MTI and Infodisc Global on August 29, 2005.

By written scheduling order, Judge Chew set January 13, 2006 as the deadline for creditors to file proof of claims. Appellants filed two Proof of Claims on January 13, 2006. The first sought $3,650,036.86, which consisted of a claim for demolition, clean-up and repair costs ($1,150,036.86) plus a claim for $2,500,000 for assets sold by the Receiver to which Landlord claimed ownership. The second proof of claim related to rent. Landlord contended its claims were administrative priority claims to be paid from the receivership estate ahead of other general secured and unsecured claims. Both the Receiver and the ICBC objected. These filings were later amended, increasing the claims to $4,491,517.90.

*Personal Liability Causes of Action*

Landlord also amended its petition to allege personal liability causes of action against the Receiver and Auctioneer, including conversion, negligence, gross negligence, and violations of the Texas Theft Liability Act. Shortly before trial, Landlord added ICBC as a defendant and alleged personal liability causes of action for (1) conspiracy between ICBC, the Receiver and the Auctioneer,

---

[2] In this sense, the Texas court ordered a liquidation receivership as opposed to a receivership to preserve property in a pre-judgment context, despite the fact that the creditor did not obtain a judgment until almost three months later. *Compare* TEX.CIV.PRAC.&REM.CODE ANN. § 31.002 (Vernon 2008) *and* TEX.CIV.PRAC.&REM.CODE ANN. Ch. 64 (Vernon 2008); *see* Mike Bernstein, *Turnover Receiverships and the Turnover Statute,* STATE BAR OF TEXAS COLLECTIONS AND CREDITORS' RIGHTS COURSE, Ch. 4, p. 8 (2009)(the point of the turnover receivership is to aid the diligent creditor in collecting its judgment while the Chapter 64 receivership contemplates a receiver running a business or preserving property in a prejudgment context).

(2) misappropriation of fiduciary property against the Receiver and the Auctioneer, and (3) breach of fiduciary duty against the Receiver. The actual damages sought totaled the same amount alleged in the amended proof of claims ($4,491,517.90). The trial court severed the conspiracy claim. It also granted partial summary judgment for the Receiver and the Auctioneer, finding that Landlord's personal liability claims against them were barred by derived judicial immunity, and that any recovery based on its proof of claims would be limited to funds held in the liquidated receivership estate.

*Pretrial Determination of Ownership*

On February 26, 2008, the trial court conducted a hearing concerning Landlord's ownership rights to assets on the Premises. Counsel for ICBC cautioned that Landlord was merely an unsecured creditor trying to take property by reclassifying it as an improvement or fixture. Landlord's attorney countered that there was no evidence that MTI owned anything on the Premises:

> [Mr. Lee]: Mediacopy, Inc., is a California corporation. It's in bankruptcy at the time. Mediacopy sends a letter or estoppel certificate to the landlord's lender that says, I am the only one allowed in the place. I'm the only one in possession.
>
> Mr. -- the lease has a specific provision that says if you want to assign the lease or sublease it to someone, you have to get my permission. He never gave his permission. It's his absolute right to assume it's Mediacopy Copy [sic], Inc., in that building. He would have no way of knowing it's Mediacopy Texas. He had a lease with Mediacopy Texas, for a different company, but it's for a different property.

Judge Chew asked counsel for the Receiver "to address particularly the argument . . . concerning Mediacopy versus Mediacopy Texas":

> [The Court]: And now we have Mediacopy Texas, Inc., as being actually in the building, how those entities are connected, if they are connected.
>
> [Mr. Slavin]: And they are, Your Honor. . . . The parties to the receivership were Mediacopy Texas, Inc., and Infodisk [sic] Global Holding, Inc.

* * * * *

[Mr. Slavin]: If you will go to tab 46 of what was filed by the landlord. . . . You'll see that it's from Infodisk [sic] Global Holdings, Inc., a wholly owned subsidiary of Infodisc Technology Company, Limited, d/b/a Mediacopy, a California corporation. So Infodisk Global Holdings, Inc., is a party to this receivership, is a party that was placed in receivership. It is d/b/a Mediacopy, Inc., and they set up Mediacopy Texas because of the Texas operation involved in its holding operation.

At this same hearing, the court addressed "the fixtures issue."

[The Court]: Okay. This is what I'm going to do. I'm going to make the best effort to go through these and see if I can -- if you will -- and make a determination of what I think is -- what I believe to be a trade fixture versus the tenant improvement.

The parties briefed for the court the distinction between leasehold improvements, which become a permanent part of the premises, and trade fixtures, which belong to the tenant. After reviewing the evidence, pleadings and legal arguments, the trial court entered its order determining ownership of the disputed assets. Proceeds from the sale of those assets totaled $16,550.

*The Jury Trial*

At trial, the Receiver, ICBC and Landlord stipulated to a Premises clean-up charge of $12,551.58 as an administrative priority claim. The parties also debated both expert and lay testimony concerning damages for repairs. Landlord designated Bill Means as an expert on repair costs. Following *Daubert*[3] hearings, the trial court struck Means as an expert. Ayoub was eventually allowed to give lay testimony that the cost to repair damages to the Premises was $6,200,000. This testimony was admitted over multiple objections from the Receiver and ICBC. The trial court submitted Landlord's quantum meruit claim for rent and repairs to the jury. It refused to submit proposed issues related to the personal liability causes of action (those dismissed by the prior partial summary judgment and those added right before trial) and issues related to ownership and value of the assets sold at liquidation.

---

[3] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *E.I. duPont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549 (Tex.1995).

The jury returned a verdict denying Landlord's claims for rent and finding that the reasonable cost of necessary repairs to the Premises caused by the Receiver totaled $3,500,000. Judge Chew granted judgment *non obstante veredicto* on the repair claims. From the receivership estate, the trial court awarded an administrative priority claim to Landlord in the sum of $16,550.00 for assets sold and $12,551.58 for cleaning charges based on the stipulation of the parties at trial. From this judgment, Landlord appeals, bringing twenty-five issues grouped into six categories.

## SUBJECT MATTER JURISDICTION

As we have noted, Mediacopy, Inc. filed for bankruptcy protection on October 22, 2004. Landlord, a creditor, received no notice of the California lawsuit filed by ICBC against MTI and Infodisc Global. It did not receive notice of the California receivership order, nor did it receive prior notice of the Texas ancillary receivership.

Standing is implicit in determining subject matter jurisdiction. *Crane v. Richardson Bike Mart, Inc.*, 295 S.W.3d 1, 3 (Tex.App.--El Paso 2009, no pet.). Consequently, standing cannot be waived and may be raised *sua sponte* by an appellate court. *Id.* at 4; *Houston Pipeline Company LP v. Bank of America, N.A.,* 213 S.W.3d 418, 429 (Tex.App.--Houston [1st Dist.] 2006, no pet.). We must first consider whether the bankruptcy stay was violated to determine whether we have jurisdiction to hear this appeal. *Id.*

### Bankruptcy Stay

The filing of a bankruptcy petition operates as an automatic stay from "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," or "any act to create, perfect, or enforce any lien against property of the estate." *Houston Pipeline,* 213 S.W.3d at 424, *quoting* 11 U.S.C.S. § 362(a)(3), (4). The Bankruptcy Code defines property of the estate broadly to include "all legal or equitable interests of the debtor in

property as of the commencement of the [bankruptcy] case." *Houston Pipeline*, 213 S.W.3d at 424, *quoting* 11 U.S.C.S. § 541(a)(1). The automatic stay is intended to include litigation, lien enforcement, and administrative proceedings that could affect or interfere with the property belonging to the bankruptcy estate. *Houston Pipeline,* 213 S.W.3d at 425. The estate encompasses possessory and ownership interests in property, including leasehold interests. *Id.* at 246. Mediacopy, Inc.'s leasehold interest in 1390 Don Haskins thus belonged to the bankruptcy estate.

Section 362(a)(3) stays "any act to obtain possession of . . . or to exercise control over property of the estate" and applies to "any action, *whether against the debtor or third-parties*, to obtain possession or to exercise control over property of the debtor." *Houston Pipeline*, 213 S.W.3d at 427, *quoting A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994, 998 (4th Cir. 1986)(emphasis in original). The 4th Circuit specifically noted that any action in which the judgment may diminish an asset of the bankruptcy estate is unquestionably subject to the stay. *A.H. Robins* 788 F.2d at 1001.

"Creditors 'are clearly parties in interest under the meaning of the Bankruptcy Code [when] they have a pecuniary interest that was adversely affected' by a postpetition transfer of property." *United States v. Miller*, No. Civ. A. 5:02-CV-0168-C, 2003 WL 23109906, at *6-7 (N.D.Tex. Dec. 22, 2003), *quoting In re Reserves Dev. Corp.*, 78 B.R. 951, 957 (W.D. Mo. 1986).

> Without [the automatic stay], certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

*Checkers Drive-In Rests., Inc. v. Comm'r of Patents & Trademarks*, 51 F.3d 1078, 1082 (D.C.Cir. 1995), *quoting* S.Rep. No. 989 at 49, 95th Cong., 2d Sess. 54 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5835, H.R.Rep. No. 595, 95th Cong. 2d Sess. 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6297).

*Analysis*

We are persuaded by the analysis in *Houston Pipeline.* 213 S.W.3d 418. Houston Pipeline, once a subsidiary of Enron, sold natural gas to the Bammel Gas Trust. Bank of America provided the loan for the purchase. Thereafter, Enron sold Houston Pipeline to AEP Energy Services and the Bammel Trust released Houston Pipeline's liabilities from the first sale. The Trust then leased natural gas in the Bammel Reservoir to BAM LeaseCo, another Enron subsidiary, but Houston Pipeline still retained the rights to use the natural gas--referred to in the opinion as "Storage Gas" --in the Bammel Reservoir. A few months later, Enron, LeaseCo, and other Enron affiliates filed for bankruptcy. The Bank filed suit in state court contending that Houston Pipeline's right to use the Storage Gas was subject to the Bank's security interest. The trial court concluded that the Bank had a first priority security interest in the Storage Gas. On appeal, the Bank alleged that the bankruptcy stay was not violated because (1) only Enron had the right to claim the stay, (2) the judgment did not affect the Enron bankruptcy estate, and (3) the stay was subsequently lifted such that the issue was moot. The appellate court disagreed. The court found that because LeaseCo – a debtor in the Enron bankruptcy--had possessory and ownership interests in the Storage Gas, it constituted property of the LeaseCo bankruptcy estate and was subject to the automatic stay. *Id.* at 425-427. The trial court's determination affected estate property because it prevented Houston Pipeline from asserting an interest in the Storage Gas in the bankruptcy court. *Id.* at 428. By excluding an interested third party--Houston Pipeline--the trial court erroneously exercised control over the Storage Gas. *Id.* A determination of which party held a superior interest in the Storage Gas was a necessary prerequisite to the Bank's settlement agreement with Enron in bankruptcy court. *Id.* Indeed, the court concluded that the declaratory judgment action itself was an act by the Bank to control property of the estate in violation of the automatic stay. *Houston Pipeline*, 213 S.W.3d

at 428. We adopt that same reasoning here.

*Void Order*

An action taken in violation of the automatic stay is void, not voidable. *Continental Casing Corp. v. Samedan Oil Corp.*, 751 S.W.2d 499, 501 (Tex. 1988). If a judgment is void because the trial court lacked jurisdiction, we must vacate the judgment and dismiss the case. TEX.R.APP.P. 43.2(e).

We readily acknowledge that Landlord did not directly challenge the trial court's jurisdiction. Nevertheless, Landlord's status as a creditor of Mediacopy, Inc. is not disputed and thus did not need to be separately challenged. *Houston Pipeline*, 213 S.W.3d at 431 (Houston Pipeline's status as a creditor of LeaseCo was clearly ascertainable from the record and did not need to be separately asserted). In any event, Landlord vehemently and repeatedly claimed that its property was being removed and sold. In addition to their petition in intervention seeking a temporary restraining order, Landlord filed a motion to vacate and terminate the ancillary receivership, complaining of lack of notice and hearing. As late as the hearing on the ownership of the fixtures, Landlord continued to press its point:

> [Mr. Lee]: Okay. I was not involved in June of '05, but if we go back to what was going on at that time, there was an auction proceeding and we tried--Mr. Haugland tried three separate times before the injunction, I think, a couple of times by letter to try and stop it. Couldn't stop it, filed an injunction, complained every day that the things that belonged to us were being sold and provided information about that.
>
> * * * * *
>
> The man owns a company, Judge, and I don't really know how to put it any better than this: It would be like if a court sent someone to my living room and said, I'm here because the guy across the street owes me money. And they said, You've got all of his stuff in here so I'm going to take that stuff and I'm going to go sell it. Forget if I want it sold or not. I'm going to go sell it and if it turns out that it didn't belong to him, we'll let you come get the money. That's what happened in this case. That building had nothing to do with the company that you took the receivership out

on.

> Mr. Ayoub is sitting there trying to figure out why is anyone even coming to my building? They don't have a lease. They don't own any of the equipment, and there's not one shred of evidence before you, Judge, that a piece of anything belonged to Mediacopy Texas, Inc., which is the company you did the receivership for.

And although the violation of the bankruptcy stay is not assigned as error on appeal, Landlord has noted these objections in its briefing:

> At all pertinent times, Mediacopy was a debtor in a bankruptcy case, styled In re Mediacopy, a California corporation, and filed in 2004 as case number LA-04-32508-SB on the docket of the United States Bankruptcy Court for the Central District of California, Los Angeles division [record citation deleted]. As a result of the automatic stay in bankruptcy proceedings, neither the trial court nor Evans had any jurisdiction or right to act with respect to Mediacopy or any of its assets at any time.

As in *Houston Pipeline*, a determination of which party held a superior interest in the improvements/fixtures/trade fixtures was a prerequisite to ICBC's agreement with MTI and Infodisc Global to liquidate all of the assets. This is particularly true since the Receiver took possession of Landlord's premises and sold its assets.

## CONCLUSION

Mediacopy, Inc. was in bankruptcy (1) at the time ICBC filed suit in California, (2) at the time of the California receivership order, (3) at the time the request for ancillary receivership was filed in Texas, (4) at the time of the Texas ancillary receivership order, (5) at the time of the auction and liquidation, (6) and at the time of the California default judgment in ICBC's favor. That the bankruptcy was later dismissed is of no moment. *Houston Pipeline*, 213 S.W.3d at 431 (subsequent lifting of the stay does not render the issue moot because the trial court entered the judgment when it did not have jurisdiction). While we recognize that years of litigation have been for naught, the parameters of our jurisdiction are clear. We vacate the judgment of the trial court and dismiss the case.

May 28, 2010

_____
ANN CRAWFORD McCLURE, Justice

Before McClure, J., Rivera, J., and Guaderrama, Judge
Guaderrama, Judge, sitting by assignment